UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RUSSEL D. GRAVES,

                        Plaintiff,

    -against-                                    7:05-CV-739
                                                        (LEK/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

## DECISION AND ORDER

**I.**      **BACKGROUND**

    **A.**      **Procedural History**

Plaintiff Russel D. Graves ("Plaintiff") protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on June 5, 2003. Administrative Transcript ("AT") at 33-36, 220-23 (Dkt. 5). The applications were denied initially and a request was made for a hearing. AT at 26, 32, 228. A hearing was held before an Administrative Law Judge ("ALJ") on July 21, 2004. AT at 234-75. In a decision dated November 26, 2004, the ALJ found that Plaintiff was not disabled. AT at 7-19. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on May 10, 2005. AT at 3-5. Plaintiff commenced this action on June 13, 2005 pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision. Compl. (Dkt. 1).

    **B.**      **Contentions**

Plaintiff makes the following claims:

(1) The Commissioner failed to assess properly the severity of Plaintiff's conditions. Plntf's Brief (Dkt. 6) at 7-10.

(2) The Commissioner failed to assess properly Plaintiff's residual functional capacity.

Plntf's Brief at 10-12.

(3) The Commissioner erroneously concluded that Plaintiff could perform his past relevant work. Plntf's Brief at 12-13.

(4) The Commissioner erroneously failed to find that the Medical-Vocational Guidelines direct a finding of disabled for a person of Plaintiff's age, education, and past relevant work experience. Plntf's Brief at 14.

(5) The Commissioner failed to assess properly Plaintiff's subjective allegations of pain and disabling symptoms. Plntf's Brief at 14-16.

Defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed. Deft's Brief (Dkt. 12).

**C.    Facts**

**1.    Non-Medical Evidence and Testimony**

Plaintiff, who was fifty-two years old at the time of the ALJ's hearing, completed an educational level through the eighth grade. AT at 58, 236-37. Plaintiff lives with his brother in a house and has custody of a grandson, who was ten-years old at the time of the ALJ's hearing. AT at 237.

Plaintiff last worked as an automobile salesman and has approximately fifteen years of experience in this field. AT at 53. Plaintiff stated that he was the "top car salesman" at one dealership for ten years. AT at 247. He also stated that he was offered a management position at one dealership, but turned down the position apparently due to the dealership's business practices.[1] AT at 253.

---

[1] It is unclear when Plaintiff was offered the position. See AT at 253.

On September 20, 2001, Plaintiff had a heart attack.[2]  AT at 74, 215.  He returned to work approximately one month later.  AT at 239.  Plaintiff stated that he worked until April of 2003.  AT at 238.  He stated that he stopped working because he was "sick a lot" with bronchitis, colds, and the flu, and because he was unproductive.  AT at 238-39.  He also stated, "[O]f course, I probably didn't stick to the diet right and all these things I'm supposed to do."  AT at 239.  However, he testified that later that year, he worked part-time at his sister's antique store "just for something to do, . . . to fulfill some hours of the day . . . [and] to see what I could do."  AT at 256.  Plaintiff stated that he would be unable to work there as a full-time clerk because he would "get too tired out.  I get exhausted."  AT at 257.

When asked about his physical capabilities, Plaintiff stated that he does "some walking" on a trail, but estimated that he could walk "maybe a couple [of] blocks" before he has to stop.  AT at 273-74.  He could lift five pounds, and could lift and carry "a bag of groceries" from a car to a house.  AT at 260, 261.  He is able to do some yard work and "can pretty much do everything around the house," including vacuuming, laundry, dusting, and preparing meals, but is unable to move a chair or couch.  AT at 262.

When asked whether fatigue is his "major problem," Plaintiff confirmed that it is.  AT at 262.  However, he stated that during the day, he takes two "catnap[s]" during which he either sleeps or "rest[s] his soul."  AT at 257-58.  Plaintiff also testified that shortness of breath is a major problem.  AT at 262.  However, Plaintiff later stated that inhalers help his breathing and that he smokes despite medical advice.  AT at 263, 266.

In addition to experiencing fatigue and shortness of breath, Plaintiff also testified to experiencing heart palpitations and chest discomfort; aching and discomfort in his lungs; a broken

---

[2] Plaintiff testified that before his heart attack in September of 2001 he experienced ministrokes, and experienced "a couple" of ministrokes in 2004.  AT at 244-45.

3

rib; pain in the left side of his back, and in the right knee, elbow and wrist; "night sweats and day sweats;" depression; anxiety; and memory problems. AT at 242-43, 246, 249, 253, 255, 258-61.

### 2. Medical Evidence

As noted above, on September 20, 2001, Plaintiff suffered an "acute inferior wall myocardial infarction." AT at 74, 215. A stent was placed during a cardiac catheterization. See AT at 103, 205, 263-64. Hospital records indicate that "about two to three months" earlier, Plaintiff experienced a "similar bout of fluttering and shortness of breath," but Plaintiff "refused" evaluation and treatment at that time. AT at 74.

Plaintiff was treated by Dr. John S. Burnett from November of 2001 to March of 2003. AT at 77-85, 124-27. Dr. Burnett diagnosed Plaintiff as suffering from, inter alia, bronchitis, coronary artery disease, hyperlipidemia, osteoarthritis, chronic obstructive pulmonary disease ("COPD"), and hypertension. Id. Dr. Burnett opined that Plaintiff's coronary artery disease was "asymptomatic" and "stable" and Plaintiff's osteoarthritis was "stable." AT at 83, 85.

Plaintiff also saw Dr. Nidal Makhoul, a cardiologist, from August of 2002 to June of 2003.[3] AT at 111-18. On August 21, 2002, Dr. Makhoul opined that Plaintiff is "stable from a cardiovascular standpoint without any anginal symptoms." AT at 118. Dr. Makhoul noted that Plaintiff was hospitalized for chest pain in May of 2001, but that Plaintiff "believes his symptoms were more anxiety than angina." AT at 117. On May 14, 2003, Dr. Makhoul noted that Plaintiff reported that "his stress and anxiety are under relatively good control." AT at 115. The results of an exercise myocardial scan performed by Dr. Makhoul on June 10, 2003 were "consistent with old inferior and inferolateral myocardial infarction with minimal peri-infarction ischemia." AT at 112.

---

[3] However, an August 21, 2002 office note suggests that Plaintiff was previously seen by Dr. Makhoul, as it was noted that Plaintiff was "seen in January." AT at 117.

In his report, Dr. Makhoul noted "[n]o exercise[-]induced chest pain or significant ECG[4] changes. Maximum workload and good exercise tolerance." Id.

In the interim, on May 8, 2003, Plaintiff was seen at Massena Memorial Hospital with complaints of pain in his chest and left shoulder. AT at 97. He was diagnosed as suffering from "unstable angina" and treated with various medications. AT at 98, 103. He was discharged the following day against medical advice. AT at 86, 87. Dr. Burnett noted that Plaintiff stated that he "was antsy and said he had to leave." AT at 87.

Plaintiff began treating with Rodney Richmond, a physician assistant ("PA"), and Anne Hall, a nurse practitioner, at Samaritan Family Health Center on September 24, 2003. AT at 205-08. Plaintiff was diagnosed as suffering from, inter alia, bronchitis, COPD, coronary artery disease, nicotine dependence, hyperlipidemia, transient ischemic attacks ("TIAs"),[5] depression, and anxiety. AT at 172-209. He was treated with various medications and encouraged to stop smoking.[6] See id.

PA Richmond referred Plaintiff to Dr. Philip Andrew, a cardiologist. AT at 171, 195. Plaintiff saw Dr. Andrew on November 5, 2003 at which time Plaintiff underwent an echocardiogram and an exercise stress test. AT at 166-69. The echocardiogram showed inter alia, "[n]o evidence of significant aortic pulmonic right heart or pericardial disease." AT at 166. The exercise stress test showed no "clear indication for further invasive coronary management at this time and the results are consistent with . . . the pre-test chest pain/discomfort appraisal as non-

---

[4] ECG refers to electrocardiogram. Dorland's Illustrated Medical Dictionary 2008 (29th ed. 2000) (hereinafter "Dorland's").

[5] An ischemic stroke is a stroke syndrome caused by a deficiency of blood in an area of the brain. Dorland's at 920, 1714.

[6] It was noted on September 24, 2003, that Plaintiff reported that he "applied for disability through Social Security. He does not know for sure what the disability is, but he is claiming that he believes it is his heart." AT at 206.

coronary." AT at 168. Dr. Andrew noted that Plaintiff experienced no chest discomfort during the test and plaintiff's treadmill performance was "average." Id.

On January 21, 2004, Plaintiff was seen at the emergency room of Samaritan Medical Center with complaints of chest pain and "visual disturbances," including flashing lights and blackouts. AT at 140-42. An echocardiogram performed the next day by Dr. Andrew showed "no definitive clue" as to the possible etiology of "recent cerebral vascular events (retinal artery occlusion) [but] [i]n any case, he remains on Coumadin."[7] AT at 163.

On April 21, 2004, Plaintiff returned to the emergency room of Samaritan Medical Center where his "chief complaint seem[ed] to be the 'flutters'" in his chest. AT at 129. It was also noted that Plaintiff was "quite" short of breath "due to his COPD," but was "pain[-]free." Id. The emergency room record also notes Plaintiff's complaints of "[b]lackouts of vision (near syncope)" and states the acronym "TIA" next to a question mark. AT at 130. Plaintiff was advised to stop smoking. AT at 131. It was determined that the fluttering sensation was due to "benign premature beats." Id.

Plaintiff followed up with PA Richmond several days later on April 26, 2004. AT at 176. PA Richmond noted that Plaintiff saw Dr. Andrew "who suggested the cause [of the palpitations] probably is pulmonary." Id. PA Richmond opined that the palpitations were "probably related to anxiety [and] [p]erhaps worsened by his lung disease." Id. However, on May 24, 2004, PA Richmond noted that Plaintiff's "palpitations are improved." AT at 172. PA Richmond also noted improvement in Plaintiff's other conditions. AT 173. Specifically, he found that Plaintiff "has no more chest pain;" Plaintiff's blood pressure is "presently reasonably well controlled;" Plaintiff's

---

[7] Coumadin is an anticoagulant. Physicians' Desk Reference 899 (61st ed. 2007) (hereinafter "PDR").

"LDL[8] was at goal last visit;" "liver function tests" were "within normal limits;" Plaintiff had "[n]o focal weaknesses recently;" and a spirometry test showed "surprising results," as PA Richmond "expected the numbers to be much worse." Id. With regard to Plaintiff's depression and anxiety, Plaintiff was referred to counseling. AT at 174, 246.

## II.     DISCUSSION

### A.     Disability Standard

To be considered disabled, a plaintiff seeking DIB or SSI benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; . . . . Assuming the claimant does not have a listed

---

[8] LDL refers to low-density lipoproteins. Dorland's at 2011.

>impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. Berry, 675 F.2d at 467 (citations omitted).

### B.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, inter alia, Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Williams on behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams, 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972); see also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212 (1983).

### C. Severity of Impairments

The definition of a severe impairment is one that significantly limits the plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521. Basic work activities are defined as the abilities and aptitudes necessary to do most jobs. They include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. § 404.1521(b)(1). Basic work activities also include mental functions required for work. Id. at (b)(3)-(6).

Plaintiff argues that the ALJ erred in determining that his TIAs, COPD, depression, and anxiety were not severe impairments. Plntf's Brief at 7-10. For support, Plaintiff cites to medical reports in which these conditions are "noted." Id. at 8-9. However, Plaintiff fails to explain specifically how these conditions significantly limit Plaintiff's physical or mental ability to do basic work activities. Nevertheless, the Court will examine the conditions in question.

Regarding TIAs, the ALJ noted Plaintiff's testimony that he had ministrokes before his heart attack occurred in September of 2001, and that Plaintiff had "a couple" of ministrokes in 2004. AT

at 11; see AT at 245.  As the ALJ noted, PA Richmond diagnosed Plaintiff as suffering from TIAs, but a carotid ultrasonograph performed on January 23, 2004 revealed "normal" peak flow velocities and only 0-15% narrowing in the proximal intracranial aneurysm on the left, which was confirmed by an April 21, 2004 carotid doppler study that showed "mild narrowing only."  AT at 11-12, see AT at 130, 136, 138-39, 173.  Moreover, as mentioned by the ALJ, PA Richmond's progress note dated May 24, 2004 suggests that Plaintiff's TIAs resolved.  AT at 12; see AT at 172.  Plaintiff claims that the April 21, 2004 emergency room record cited TIAs "as a possible cause" of his "intermittent blackout and near-syncope episodes."  Plntf's Brief at 8.  As previously mentioned, the emergency room record notes Plaintiff's complaints of blackouts of vision and states the acronym "TIA" next to a question mark.  AT at 130.  It is unclear whether the reference to TIAs is based on Plaintiff's own reported complaints.  Id.  In light of the foregoing, the ALJ's determination that TIAs were not a severe impairment is supported by substantial evidence.

Regarding COPD, as the ALJ noted, "physical examinations have shown 'somewhat' diminished lung sounds and wheezes, [but] there is no evidence of rales or rhonchi and his air entry has been consistently good."  AT at 12; see AT at 141, 145, 173-74, 176, 187.  The ALJ also pointed out that medications were "relatively effective" in controlling Plaintiff's symptoms.  AT at 12.  Indeed, on May 24, 2004, PA Richmond noted that Plaintiff "uses his Combivent and Advair.[9] I suspect the Advair has improved his numbers since its institution."  AT at 174.  Moreover, Plaintiff himself testified that inhalers have helped his breathing.  AT at 266.  Further, as noted by the ALJ, PA Richmond performed a spirometry test on May 24, 2004 which showed results that PA Richmond found "surprising in this patient, [because] I expected the numbers to be much worse."  AT at at 12; see AT at 173.  PA Richmond commented that Plaintiff's lungs "are actually quite clear

---

[9] Combivent is used for the treatment of bronchospasm.  PDR at 848.  Advair is used for the treatment of asthma.  Id. at 1311.

with good air entry bilaterally. No wheezes, rales, or rhonchi." Id. In light of the foregoing, the ALJ's determination that COPD was not a severe impairment is supported by substantial evidence.

Regarding depression and anxiety, the ALJ noted that Plaintiff testified that he experienced a "dramatic" change in his personality after his brother died and after Plaintiff had a heart attack. at 12; see AT at 247-48. However, as discussed by the ALJ, PA Richmond noted on September 24, 2003 that Plaintiff "[s]pecifically" denied experiencing depression and that he was sleeping and eating "normally." AT at 12; see AT at 207. While Plaintiff was later prescribed antidepressant medication, including Lexapro,[10] PA Richmond opined that Lexapro "may have helped" Plaintiff's condition. AT at 176. Moreover, while PA Richmond opined on April 26, 2004 that Plaintiff's palpitations were "probably related to anxiety," on May 24, 2004, he noted that Plaintiff reported improvements in his sleep and the palpitations. AT at 172, 176. Further, as noted by the ALJ, Plaintiff met with a counselor on only one occasion. AT at 12; see AT at 174, 246-47. Based on the foregoing, the ALJ's finding that depression and anxiety were not severe impairments is supported by substantial evidence.

### D.  Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. See 20 C.F.R. §§ 404.1529, 416.929; see also

---

[10]  Lexapro is used for the treatment of depression. PDR at 1190.

Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. Id. §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. Id. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ determined that Plaintiff has underlying impairments that "may reasonably result in the symptoms alleged." AT at 17. However, the ALJ then "decline[d] to accept that such impairments result in the degree of limitation alleged by the claimant" and found that Plaintiff's credibility was "fair." AT at 17. For the following reasons, the Court finds that the ALJ's credibility determination is supported by substantial evidence in the record.

In determining Plaintiff's credibility, the ALJ reviewed and discussed the following factors including: Plaintiff's daily activities; the location, duration, frequency, and intensity of Plaintiff's

symptoms; precipitating and aggravating factors; the type, effectiveness, and side effects of medication taken to relieve symptoms; other treatment received to relieve symptoms; and measures taken by Plaintiff to relieve symptoms. AT at 15-16.

The ALJ also pointed out Plaintiff's testimony that following his heart attack in September of 2001, Plaintiff was able to return to work as an automobile salesman and worked until April of 2003. AT at 16; see AT at 53, 240. Moreover, Plaintiff testified that later that year, in order to have "something to do, . . . to fulfill some hours of the day, [and] . . . to see what I could do," he worked in his sister's antique store and still visits the store to "hang out a little bit." AT at 256-57 (emphasis added). In determining credibility, the ALJ must consider statements from the claimant regarding efforts to work. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *5 (SSA 1996).

The ALJ also pointed out the inconsistent nature of statements made by Plaintiff. AT at 16. Specifically, the ALJ noted that Plaintiff stated that he "was missing work frequently because of 'winter illnesses' and given that he was not selling many cars, he resigned." AT at 17. Indeed, at the hearing, Plaintiff stated that he stopped working because he was "sick a lot," was "not really performing well" and because "of course, I probably didn't stick to the diet right and all these things I'm supposed to do." AT at 238-39. However, as noted by the ALJ, Plaintiff stated in his initial filing for benefits that he was unable to work due to fatigue, difficulty breathing, and chest pain on exertion. AT at 17, see AT at 43. Moreover, PA Richmond's progress note dated September 24, 2003 states that Plaintiff "applied for disability through Social Security. He does not know for sure what the disability is, but he is claiming that he believes it is his heart." AT at 206. The Court notes that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5.

13

In light of the foregoing, the ALJ's determination of Plaintiff's credibility is supported by substantial evidence.

### E.     Residual Functional Capacity

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545; 416.945; see Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)(citing LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  Verginio v. Apfel, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998); LaPorta, 737 F. Supp. at 183 (citation omitted).

In this case, the ALJ found that Plaintiff retains the RFC to perform light work[11] that includes lifting and carrying no more than twenty pounds occasionally and ten pounds frequently.  AT at 18.  However, Plaintiff argues that the RFC determination is flawed because his conditions result in limitations that "are inconsistent with the ability to perform even sedentary work."  Plntf's Brief at 11.  The Court will examine each limitation in turn.

First, Plaintiff argues that TIAs "cause him to suffer intermittent episodes of blackouts and syncope."  Plntf's Brief at 11.  For support, Plaintiff points to the April 21, 2004 emergency room record which states, "Blackouts of vision (near syncope)" and the acronym "TIA" next to a question

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

mark. Id.; see AT at 130. However, as noted, it is unclear whether this latter statement was based entirely on Plaintiff's own complaints. Plaintiff also points to PA Richmond's progress note dated November 19, 2003, which states that Plaintiff was diagnosed as suffering from TIAs. See AT at 194. However, the progress note provides no documentation of "intermittent episodes of blackouts and syncope." See AT at 193-94. Moreover, a progress note dated May 24, 2004 suggests that the TIAs and any visual disturbances had resolved, as PA Richmond opined, "[W]hen he had his [TIAs,] his vision was disturbed, [this is] no longer the case." AT at 172. Moreover, Dr. Makhoul noted on May 14, 2003 that Plaintiff "denies any syncope [or] near syncope." AT at 115. Accordingly, the ALJ properly found no limitation encompassing "intermittent episodes of vision blackouts and syncope" due to TIAs.

Second, Plaintiff argues that his COPD causes shortness of breath "with even minimal exertion." Plntf's Brief at 11. For support, Plaintiff points to portions of the record that document his subjective complaints of shortness of breath. Id.; see AT at 80, 129, 173, 186, 193, 197. However, the regulations provide that statements about symptoms will not alone establish that a claimant is disabled. 20 C.F.R. § 404.1529(a). There must be medical signs and laboratory findings which show a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged.[12] Id. Here, chest x-rays show only "[b]orderline to mild cardiomegaly" and a "[s]mall band of atelectasis . . . in the right lung base medially." AT at 137, 155, 183. Chest x-rays also show, inter alia, a normal chest, clear lungs, "[n]o active disease," and "no acute cardiopulmonary disease." AT at 89, 136, 137, 150, 183, 191. Moreover, spirometry testing performed by PA Richmond on May 24, 2004 showed a "FEV1 of 2.17 which is actually 82%

---

[12] Respiratory impairments, such as COPD, usually can be evaluated on the basis of a complete medical history, physical examination, a chest x-ray or other appropriate imaging techniques, and spirometric pulmonary function tests. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 3.00(A), 3.02(A).

15

predicted and the ratio FEV1 to FVC was 84%[-]103% predicted."[13]  AT at 173.  PA Richmond found these results "surprising" because he expected "the numbers to be much worse."  AT at 173.  He also noted that Advair had improved Plaintiff's "numbers since its institution."  AT at 174.  Additionally, the results of the exercise myocardial scan performed by Dr. Makhoul on June 10, 2003 showed, "No exercise induced chest pain or significant ECG changes.  Maximum workload and good exercise tolerance."  AT at 112.  Dr. Makhoul concluded that Plaintiff's exercise tolerance is "[s]table."  Id.  Similarly, during the exercise stress test performed on November 5, 2003, Plaintiff's treadmill performance was "average" and it was also noted that "[n]o chest discomfort occurred on this test."  AT at 168.  Accordingly, the ALJ properly found no limitation encompassing shortness of breath "with even minimal exertion."

       Third, Plaintiff argues that his anxiety and depression "cause him to suffer fatigue, insomnia, and panic attacks et al."  Plntf's Brief at 11.  For support, Plaintiff cites to, inter alia, an August 21, 2002 progress note by Dr. Makhoul in which he stated that Plaintiff is "[e]ncouraged . . . to follow up with his primary care provider in regards to depression/anxiety symptoms."  Id.; see AT at 118.  However, on May 14, 2003, Dr. Makhoul noted that Plaintiff "feels his stress and anxiety are under relatively good control."  AT at 115.  Plaintiff also points to a February 10, 2004 progress note in which Nurse Hall noted Plaintiff's complaints of anxiety, depression, and difficulty sleeping, adding that Plaintiff "has been on Wellbutrin, but states that he now has insomnia and is not sleeping well."  AT at 186.  However, PA Richmond subsequently changed Plaintiff's medication to Lexapro on February 23, 2004, noting, "I will give him a month on this before we have him go back to work."  AT at 181.  On April 26, 2004, PA Richmond noted that Plaintiff complained of "a little trouble" sleeping at night and complained of experiencing panic attacks, but PA Richmond found that

---

[13] FEV refers to forced expiratory volume.  Dorland's at 2009.  FVC refers to forced vital capacity.  Id.

16

Lexapro had helped Plaintiff to some extent. AT at 176. PA Richmond noted on that date that Plaintiff had also experienced palpitations, which were "probably due to anxiety." Id. However, on May 24, 2004, PA Richmond noted that Plaintiff reported improvement in both his sleep and the palpitations. AT at 172. It is also noted that Plaintiff met with a counselor on only one occasion. AT at 246-47. Accordingly, the ALJ properly found no limitation providing for "fatigue, insomnia, and panic attacks" due to anxiety and depression.

Additionally, Plaintiff's claims are further belied by his testimony at the hearing. Plaintiff stated that he had a heart attack in September of 2001, but returned to work approximately one month later and worked until April of 2003. AT at 239-40. He testified that later that year, however, he started working part-time at his sister's antique store "just for something to do, . . . to fulfill some hours of the day, [and] to see . . . what I could do." AT at 256. Moreover, Plaintiff stated that he is able to do some yard work and "can pretty much do everything around the house" except for moving a chair or couch. AT at 262. He also noted that medication helps his breathing and he continues to smoke despite medical advice. AT at 263, 266. In light of the foregoing, the Court finds that Plaintiff's challenge to the RFC determination is unavailing.[14]

To the extent that Plaintiff argues that the RFC determination is flawed because the ALJ failed to consider his impairments in combination, under the regulations, an ALJ must consider the limiting effects of all impairments, including those that are not severe. 20 C.F.R. §§ 404.1545(e), 404.1523. A review of the ALJ's decision reflects that he considered Plaintiff's impairments in combination while determining Plaintiff's RFC. See AT at 15-17. Accordingly, the Court finds this

---

[14] Plaintiff also argues that his "advanced coronary artery disease" caused him to suffer from heart attacks and frequent chest pain. Plntf's Brief at 11. For support, Plaintiff cites to the "medical record generally." Id. General Order 18 requires that in social security appeals, "[e]ach contention must be supported by specific reference to the portion of the record relied upon . . . ." " General Order Number 18 (1)(c) (N.D.N.Y. Sept. 12, 2003) (emphasis added). Therefore, this citation is insufficient to support Plaintiff's claim.

claim unavailing.

### F.     Past Relevant Work

"[I]n order to determine at step four whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities." Kerulo v. Apfel, No. 98 Civ. 7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (citations omitted). Moreover, in finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain, inter alia, a finding of fact as to the physical and mental demands of the past job/occupation. SSR 82-62, 1982 WL 31386, at *4 (SSA 1982); see also SSR 82-61, 1982 WL 31387 (SSA 1982).

Plaintiff argues that the ALJ failed to give careful consideration to the requirements of his past work. Plntf's Brief at 12-13. In his decision, the ALJ stated

> The evidence in this case establishes that the claimant has past relevant work as [a] car salesman, which according to claimant's description of lifting no more than 10 pounds, is consistent with light work. Accordingly, I find that the claimant could return to his past relevant work as a car salesman as he actually performed it and as it is usually performed in the national economy.

AT at 17.

In this case, although the ALJ cited the lifting requirement of Plaintiff's past relevant work, the ALJ made no finding of fact as to the remaining physical and mental demands of Plaintiff's past relevant work, which was error. See SSR 82-62, 1982 WL 31386, at *4; Steficek v. Barnhart, 462 F. Supp. 2d 415, 421 (W.D.N.Y. 2006) (holding that ALJ "erred by concluding that plaintiff could perform his past relevant work . . . without making specific findings as to the physical and mental demands of that work.") (citing, inter alia, French v. Apfel, 62 F. Supp. 2d 659, 664 (N.D.N.Y. 1999) (Kahn, D.J.) (holding that ALJ's analysis of whether plaintiff could perform past relevant

18

work was "deficient" because ALJ did not make "explicit findings regarding the actual physical and mental demands of the plaintiff's past relevant work.")). Moreover, while the ALJ may have discharged his duty by referencing the Dictionary of Occupational Titles, he failed to state in his decision whether he referenced this source. See French, 62 F. Supp. 2d at 664 (citing SSR 82-61, 1982 WL 31387, at *2). Therefore, the Court is unable to conclude that the ALJ's finding that Plaintiff is capable of returning to his past relevant work is supported by substantial evidence. Accordingly, the matter must be remanded. On remand, the ALJ must make explicit findings regarding the physical and mental demands of Plaintiff's past relevant work and then discuss those demands compared to Plaintiff's residual capabilities.

### III. CONCLUSION

Based on the foregoing discussion, it is hereby

**ORDERED**, that the case be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this Decision and Order, and it is further

**ORDERED**, that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED**.

DATED:    January 04, 2008
          Albany, New York

Lawrence E. Kahn
U.S. District Judge